1
2
3
4
5
6
7

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

DONALD HARRY JAMES,                    No. CIV S-06-2911-GEB-CMK-P

           Petitioner,

    vs.                                            <u>FINDINGS AND RECOMMENDATIONS</u>

KEN CLARK, et al.,

           Respondents.

_____/

        Petitioner, a state prisoner proceeding pro se, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.   Pending before the court are petitioner's petition for a writ of habeas corpus (Doc. 1), respondents' answer (Doc. 9), and petitioner's reply (Doc. 13).

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

1

# I. BACKGROUND

## A.  Facts[1]

The state court recited the following facts, and petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

> In the late afternoon of May 20, 2001, Steven Smith and his family noticed smoke coming from the trees along Highway 50 in Placerville. While his wife phoned 911, Smith went into the woods to investigate. He found defendant sitting on the ground leaning against a tree. Defendant had no shirt on and was badly burned on the upper part of his body. Smith continued on to where the fire was burning.
>
> After crawling through thick brush, he came to a campsite with a tent. There were multiple small fires scattered through the area on the dirt and grass. As he was trying to put out the fires, he heard someone moaning and gasping for air. He discovered a woman, later identified as Charlene Stollberg, who was severely burned and said she needed air. He asked the woman what had happened. She said, "gas," "threw," and "me" while she was gasping for air.
>
> The fire department soon came on the scene. Firefighter and paramedic Jason Dosh asked Stollberg what had happened. She said, "[h]e tried to kill me. He poured the gasoline on me and he lit me on fire." Stollberg was taken to the hospital, where she died from her injuries. The pattern of the fire was unusual in that it consisted of several isolated fires that were not connected. It did not appear that vegetation had burned in any of the spots, nor were there signs of an ignition source such as matches. Instead, it appeared something placed on the spots had burned. In some of the dirt areas that burned, investigators could smell flammable liquid.
>
> The investigators concluded some of the burned areas were the result of the victim moving through the area and shedding pieces of burning clothing. Other burned areas were the result of gasoline being splashed around while the victim was moving, just before she was ignited. Not all of the gasoline was landing on the victim, some of it was splashed around her.
>
> Ninety-eight percent of Stollberg's body suffered third-degree burns. Only the bottoms of her feet and the tops of her feet around her toes were spared. Because of the odor detected when Stollberg's body bag was opened and the uniformity and severity of her burns, the pathologist concluded she had been doused with an accelerant over her whole body, as opposed to just being splashed on one side.

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct." Petitioner bears the burden of rebutting this presumption by clear and convincing evidence. See id. These facts are, therefore, drawn from the state court's opinion(s), lodged in this court. Petitioner may also be referred to as "defendant."

By contrast, defendant suffered largely second degree burns over 30 to 35 percent of his body. The burns were predominately to his front torso. The location of the burns on the front of the body were consistent with someone getting accelerant on himself while dousing another person.

Police interviewed defendant several months after the fire. He said he lived at the isolated campsite. He did not remember anything about the night of the fire. He had been delusional and had a hallucination that he was attacked with a two-by-four that was on fire. He had been drinking that night and was "pretty wiped out" on booze. He claimed no one had been with him the day of the fire. He said he and Stollberg had been friends, although they used to argue and she chewed him out all the time. Once they got in a fight and she broke his ribs, and once he had to call the police when she refused to return his traveler's checks.

One week prior to the fire, Placerville Police contacted defendant as he was walking along the road at the west end of Placerville carrying a red gas can. Defendant was not stable on his feet and requested assistance in getting gasoline. The officers purchased about three gallons of gasoline for defendant. They determined he was not able to carry the gas can back to his campsite, so they helped him take it back to his campsite. Defendant indicated he needed the gasoline for his generator. After the fire, a melted red plastic gasoline can and a generator were recovered at the campsite. There were household items at the campsite as well, including a television, refrigerator, stove, and radio.

**B.**   **Procedural History**

Petitioner was convicted following a jury trial of first degree murder. The jury found that the murder involved the infliction of torture. The trial court found that petitioner had a prior conviction for first degree murder. Petitioner was sentenced to life in prison without the possibility of parole. Petitioner's conviction and sentence were affirmed on direct appeal in a reasoned decision issued on September 19, 2005. The California Supreme Court denied direct review without citation or comment on January 4, 2006. Petitioner did not file any state post-conviction actions. Respondents concede petitioner's claims are exhausted.

**II. STANDARDS OF REVIEW**

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable. See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998). The AEDPA

1  does not, however, apply in all circumstances.  When it is clear that a state court has <u>not</u> reached

2  the merits of a petitioner's claim, because it was not raised in state court or because the court

3  denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal

4  habeas court must review the claim de novo.  <u>See</u> <u>Pirtle v. Morgan</u>, 313 F.3d 1160 (9th Cir.

5  2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach

6  petitioner's claim under its "re-litigation rule"); <u>see also</u> <u>Killian v. Poole</u>, 282 F.3d 1204, 1208

7  (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on

8  perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the

9  evidentiary hearing in federal court); <u>Appel v. Horn</u>, 250 F.3d 203, 210 (3d Cir.2001) (reviewing

10  petition de novo where state court had issued a ruling on the merits of a related claim, but not the

11  claim alleged by petitioner).  When the state court does not reach the merits of a claim,

12  "concerns about comity and federalism . . . do not exist."  <u>Pirtle</u>, 313 F. 3d at 1167.

13       Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is

14  not available for any claim decided on the merits in state court proceedings unless the state

15  court's adjudication of the claim:

16            (1) resulted in a decision that was contrary to, or involved an
             unreasonable application of, clearly established Federal law, as determined
17            by the Supreme Court of the United States; or

18            (2) resulted in a decision that was based on an unreasonable
             determination of the facts in light of the evidence presented in the State
19            court proceeding.

20  28 U.S.C. § 2254(d); <u>see also</u> <u>Penry v. Johnson</u>, 532 U.S. 782, 792-93 (2001); <u>Williams v.</u>

21  <u>Taylor</u>, 529 U.S. 362 (2000); <u>Lockhart v. Terhune</u>, 250 F. 3d 1223, 1229 (9th Cir. 2001).  Thus,

22  under § 2254(d), federal habeas relief is available where the state court's decision is "contrary to"

23  or represents an "unreasonable application of" clearly established law.  Under both standards,

24  "clearly established law" means only those holdings of the United States Supreme Court as of the

25  time of the relevant state court decision.  <u>See</u> <u>Carey v. Musladin</u>, 127 S.Ct. 649, 653-54 (2006).

26  "What matters are the holdings of the Supreme Court, not the holdings of lower federal courts."

1   Plumlee v. Masto, 512 F.3d 1204 (9th Cir. Jan. 17, 2008) (en banc).

2            In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a

3   majority of the Court), the United States Supreme Court explained these different standards.   A

4   state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by

5   the Supreme Court on the same question of law, or if the state court decides the case differently

6   than the Supreme Court has on a set of materially indistinguishable facts.   See id. at 405.   A state

7   court decision is also "contrary to" established law if it applies a rule which contradicts the

8   governing law set forth in Supreme Court cases.   See id.   In sum, the petitioner must demonstrate

9   that Supreme Court precedent requires a contrary outcome because the state court applied the

10  wrong legal rules.   Thus, a state court decision applying the correct legal rule from Supreme

11  Court cases to the facts of a particular case is not reviewed under the "contrary to" standard.   See

12  id. at 406.   If a state court decision is "contrary to" clearly established law, it is reviewed to

13  determine first whether it resulted in constitutional error.   See Benn v. Lambert, 293 F.3d 1040,

14  1052 n.6 (9th Cir. 2002).   If so, the next question is whether such error was structural, in which

15  case federal habeas relief is warranted.   See id.   If the error was not structural, the final question

16  is whether the error had a substantial and injurious effect on the verdict, or was harmless.   See id.

17           State court decisions are reviewed under the far more deferential "unreasonable

18  application of" standard where it identifies the correct legal rule from Supreme Court cases, but

19  unreasonably applies the rule to the facts of a particular case.   See id.; see also Wiggins v. Smith,

20  123 S.Ct. 252 (2003).   While declining to rule on the issue, the Supreme Court in Williams,

21  suggested that federal habeas relief may be available under this standard where the state court

22  either unreasonably extends a legal principle to a new context where it should not apply, or

23  unreasonably refuses to extend that principle to a new context where it should apply.   See

24  Williams, 529 U.S. at 408-09.   The Supreme Court has, however, made it clear that a state court

25  decision is not an "unreasonable application of" controlling law simply because it is an erroneous

26  or incorrect application of federal law.   See id. at 410; see also Lockyer v. Andrade, 123 S.Ct.

1166, 1175 (2003).  An "unreasonable application of" controlling law cannot necessarily be found even where the federal habeas court concludes that the state court decision is clearly erroneous.  See Lockyer, 123 S.Ct. at 1175.  This is because ". . . the gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."  Id.  As with state court decisions which are "contrary to" established federal law, where a state court decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless unavailable if the error was non-structural and harmless.  See Benn, 283 F.3d at 1052 n.6.

The "unreasonable application of" standard also applies where the state court denies a claim without providing any reasoning whatsoever.  See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000).   Such decisions are considered adjudications on the merits and are, therefore, entitled to deference under the AEDPA.  See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982. The federal habeas court assumes that state court applied the correct law and analyzes whether the state court's summary denial was based on an objectively unreasonable application of that law.  See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

## III.  DISCUSSION

Petitioner raises the same four claims he raised on direct appeal.  Specifically, petitioner argues:  (1) the evidence was insufficient to support a conviction for first degree torture murder; (2) the trial court erred in admitting evidence of a prior first degree murder conviction; (3) the trial court erred in excluding evidence that the victim had confessed to strangling another man; and (4) the trial court erred in admitting 1974 police reports.  Petitioner also suggests that his counsel was somehow ineffective with respect to the evidence of the victim's confession.[2]

---

[2]        No ineffective assistance of counsel claims were ever raised in state court.

1          A.      **Sufficiency of the Evidence**

2                  When a challenge is brought alleging insufficient evidence, federal habeas corpus

3    relief is available if it is found that, upon the record of evidence adduced at trial, viewed in the

4    light most favorable to the prosecution, no rational trier of fact could have found proof of guilt

5    beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 319 (1979).[3]  Under Jackson,

6    the court must review the entire record when the sufficiency of the evidence is challenged on

7    habeas.  See id.  It is the province of the jury to "resolve conflicts in the testimony, to weigh the

8    evidence, and to draw reasonable inferences from basic facts to ultimate facts."  Id.  "The

9    question is not whether we are personally convinced beyond a reasonable doubt.  It is whether

10   rational jurors could reach the conclusion that these jurors reached."  Roehler v. Borg, 945 F.2d

11   303, 306 (9th Cir. 1991);  see also Herrera v. Collins, 506 U.S. 390, 401-02 (1993).  The federal

12   habeas court determines sufficiency of the evidence in the context of the substantive elements of

13   the criminal offense, as defined by state law.  See Jackson, 443 U.S. at 324 n.16.

14                 In cases where the jury is presented with alternate bases for criminal liability

15   under a single theory (i.e., first degree murder based either on torture or premeditation),

16   insufficient evidence as to one basis does not warrant reversal as long as the evidence is

17   sufficient as to any other basis.  See Griffin v. United States, 502 U.S. 46, 59 (1991).  Insufficient

18   evidence on one basis for liability would only require reversal of the entire conviction if one of

19   the bases of liability was legally inadequate because "there is no reason to think that [the jury's]

20   own intelligence and expertise will save them from . . . error."  Id. at 59.  A claim of

21   insufficiency of the evidence goes to factual, as opposed to legal, adequacy and "jurors are well

22

23          [3]      Even though Jackson was decided before AEDPA's effective date, this expression
24   of the law is valid under AEDPA's standard of federal habeas corpus review.  A state court
     decision denying relief in the face of a record establishing that no rational jury could have found
     proof of guilt beyond a reasonable doubt would be either contrary to or an unreasonable
25   application of the law as outlined in Jackson.  Cf. Bruce v. Terhune, 376 F.3d 950, 959 (denying
     habeas relief on sufficiency of the evidence claim under AEDPA standard of review because a
26   rational jury could make the finding at issue).

1  equipped to analyze the evidence . . . ." Id. (emphasis in original); cf. Zant v Stephens, 462 U.S.

2  862, 880-84 (1983) (refusing to set aside a capital conviction because one of the alleged

3  aggravating circumstances was found to be unconstitutionally vague because the jury made

4  specific findings as to other, legally and factually adequate aggravating circumstances).

5      Petitioner argues:

> James' main[] defense to the charged crime of first degree murder
> was lack of proof beyond a reasonable doubt that he was the person who
> set Charlene Stollberg on fire.  They jury was instructed on [t]wo theories
> of 1st degree murder, torture murder and premeditated murder.  The
> prosecutor argued both and that the jurors need not agree on the theory.
> The jury was given no lesser included offenses to 1st degree murder.
> James alternatively argues that if the jury believed he killed Stollberg, the
> jury could not find him guilty unless . . . it found beyond a reasonable
> doubt that he acted with torture or premeditation and deliberation.
> James challenges the sufficiency of the evidence to prove that he
> had the necessary mental state for torture murder or premeditated and
> deliberate murder and for the torture special circumstance and assumes
> solely for purposes of this argument that he killed Stollberg.

13  As to torture murder, petitioner cites California Penal Code § 190.2(a)(18) and contends:

> In James' case there was insufficient evidence . . . that he acted
> with "the purpose of revenge, extortion, persuasion, or for any sadistic
> purpose," a required element of both torture murder and the torture-murder
> special circumstance.

17  As to premeditated murder, petitioner argues that "[t]here was also no evidence that James had a

18  premeditated and deliberate intent to kill Stollberg, only speculation that he did."

19      The California Court of Appeal addressed petitioner's sufficiency of the evidence

20  claims on direct appeal and provided the following background:

> The jury was instructed on two theories of first degree murder,
> premeditated murder and murder by torture.  Defendant was charged with
> two separate special allegations pursuant to section 190.2:  murder with
> torture, and a prior first degree murder conviction.  A verdict of guilt on
> either theory of first degree murder coupled with a true finding as to either
> of the special allegations was sufficient to subject the defendant to life in
> prison without the possibility of parole.  (citation omitted).  Defendant was
> found guilty of first degree murder, and the jury found true the special
> allegation that the murder was intentional and involved the infliction of
> torture.  (citation omitted).  The trial court found true the prior first degree
> murder conviction allegation.

8

From this it appears that the jury did not specify upon which basis its first degree murder finding was based.  It could have been based on either premeditation or torture, or both.  The state court continued its analysis as follows:

> Defendant argues there was insufficient evidence of the required mental state for first degree murder (either torture murder or premeditated murder) or the special allegation of torture.  He argues there was no evidence he acted with the purpose of revenge, extortion, persuasion, or for any sadistic purpose.  (citation omitted).  We shall not address whether the evidence was sufficient to support a finding the proper mental state was present for torture murder because we conclude there was sufficient evidence the murder was premeditated.  We likewise shall not address whether there was sufficient evidence of the torture special allegation because it was uncontroverted defendant suffered a prior first degree murder conviction, and this special allegation alone was sufficient to elevate the sentence to life in prison without parole.  (citation omitted).

At the outset, the court finds that this approach was entirely appropriate given the rule of Griffin.  Specifically, as long as one theory supported the first degree murder conviction, the entire conviction is sound even if the evidence is insufficient on the other theory.  In this case, petitioner challenges both theories put forward for first degree murder – torture and premeditation.  If the state court is correct that the evidence is sufficient to support premeditation, then it is irrelevant whether it was sufficient to support torture.  As to special circumstances, petitioner only challenges the torture murder allegation.  He does not challenge the prior conviction allegation because, as the state court observed, it was undisputed he had a prior first degree murder conviction.  Therefore, the state court's decision to ignore his special circumstance claim was appropriate.  The only issue is whether the evidence was sufficient to support first degree murder based on premeditation.

The state court began its analysis of petitioner's argument concerning deliberation with a summary of the relevant California law:

> In determining whether the evidence is supportive of an inference of premeditation, we are guided by these three factors set forth in *People v. Anderson* (1968) 70 Cal.2d 15, 26-27:  (1) planning activity; (2) motive established by a prior relationship and/or conduct with the victim; and (3) manner of killing.  (additional citation omitted).  The [California] Supreme Court has explained that it typically sustains verdicts where there is

1    evidence of all three factors.  (citation omitted).  Otherwise, extremely
     strong evidence of planning activity, or evidence of motive in conjunction
2    with either planning or manner of killing is required.  (citation omitted).

3    Thus, under the California Supreme Court's formulation, California law permits an inference of

4    premeditated murder if any one of the following four expressions is true:

5                    1.      Evidence = planning + motive + manner;

6                    2.      Evidence = strong showing of planning;

7                    3.      Evidence = motive + planning; or

8                    4.      Evidence = motive + manner.

9    In petitioner's case, the Court of Appeal concluded that there was evidence of all three elements:

10                   Here, we find some evidence of all three factors.  There was
     evidence defendant purchased gasoline the week before he used it to kill
11   Stollberg.  The jury could have believed defendant purchased the gasoline
     for the purpose of using it on Stollberg.  There was evidence of a stormy
12   relationship between defendant and Stollberg.  She had refused to return
     his traveler's check to him, and he stated in his interview she had kicked
13   him and broken his ribs, and that she chewed him out all the time.  Finally,
     the manner of killing suggests premeditation.  There was evidence
14   defendant poured gasoline over Stollberg's entire body.  He did not just
     throw gasoline on one side of her, then set her on fire.  There was also
15   evidence he followed her around and doused her with gasoline, since
     gasoline burns appeared in more than one place.  We can infer from this
16   that it took some time for defendant to completely cover Stollberg in
     gasoline, then set her on fire.  This was enough time for defendant to
17   reflect on his decision to kill Stollberg.  Premeditation is not measured by
     the duration of the reflection, since a cold and calculated decision to kill
18   can be arrived at very quickly.  (citation omitted).
                     We do not substitute our judgment for that of the jury, but affirm
19   the verdict if any rationale trier of fact could find premeditation and
     deliberation beyond a reasonable doubt.  (citation omitted).  We conclude
20   a reasonable juror could have found premeditation beyond a reasonable
     doubt.

21

22                   Because the state court reviewed the evidence to determine whether a rational jury

23   could find premeditation, the court concludes that it applied the correct test under Jackson.

24   Therefore, this court reviews to determine whether the state court's decision was an unreasonable

25   application of Jackson.  In reviewing under this standard, the court first observes that petitioner

26   has not presented any clear and convincing evidence which would rebut the presumption that the

1    state court's factual determinations are accurate.  See  28 U.S.C. § 2254(e)(1).  In light of the

2    facts as determined by the state court, this court must conclude that the state court's application

3    of Jackson was not unreasonable.  Specifically, the court agrees with the Court of Appeal that the

4    evidence was sufficient to permit any rational jury to conclude that petitioner killed with

5    premeditation.  Petitioner admitted that he and the victim had argued in the past, supporting a

6    motive to kill based on a past relationship.  Further, the evidence supports a finding of planning

7    because petitioner obtained three gallons of gasoline prior to the murder.  The jury could also

8    have concluded that the manner of the killing required deliberation given that the victim was

9    burned over her entire body, suggesting that petitioner had completely doused her.

10           Because the evidence was sufficient to support first degree murder based on

11   premeditation, it is not necessary to consider whether it was also sufficient to support murder

12   based on torture.

13   **B.    Evidentiary Rulings**

14           A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of a

15   transgression of federal law binding on the state courts.  See Middleton v. Cupp, 768 F.2d 1083,

16   1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  It is not

17   available for alleged error in the interpretation or application of state law.  Middleton, 768 F.2d at

18   1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786

19   F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be utilized to try state issues de novo.

20   See Milton v. Wainwright, 407 U.S. 371, 377 (1972).

21           However, a "claim of error based upon a right not specifically guaranteed by the

22   Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so

23   infects the entire trial that the resulting conviction violates the defendant's right to due process."

24   Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th

25   Cir. 1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941).  Because federal habeas

26   relief does not lie for state law errors, a state court's evidentiary ruling is grounds for federal

1   habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due

2   process.  See Drayden v. White, 232 F.3d 704, 710 (9th Cir. 2000); Spivey v. Rocha, 194 F.3d

3   971, 977-78 (9th Cir. 1999); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991); see

4   also Hamilton v. Vasquez, 17 F.3d 1149, 1159 (9th Cir. 1994).   In order to raise such a claim in

5   a federal habeas corpus petition, the "error alleged must have resulted in a complete miscarriage

6   of justice."  Hill v. United States, 368 U.S. 424, 428 (1962); Crisafi v. Oliver, 396 F.2d 293, 294-

7   95 (9th Cir. 1968); Chavez v. Dickson, 280 F.2d 727, 736 (9th Cir. 1960).

8            Petitioner challenges three evidentiary rulings.  He asserts the trial court:  (1) erred

9   in admitting evidence of his prior first degree murder conviction; (2) erred in excluding evidence

10  of the victim's confession that she had stabbed someone; and (3) erred in admitting evidence of

11  1974 police reports.

12           1.     Prior Murder Conviction

13           Regarding petitioner's prior first degree murder conviction, the Court of Appeal

14  provided the following background:

15           The prosecutor presented evidence that in 1974, defendant slashed
            the throat of Betty Keith, the woman with whom he was living, and
16          dumped her body in the San Francisco Bay.  Evidence was presented that
            defendant confessed the killing to his brother, telling him he cut Keith's
17          throat because she talked too much.  He told his brother that Keith "sure
            looked surprised" when he did it.
18          The trial court admitted the evidence regarding the 1974 killing
            after the prosecutor brought a motion in limine to allow the evidence
19          pursuant to Evidence Code Section 1101.  The trial court instructed the
            jury that the evidence relating to the 1974 killing had limited admissibility.
20          The jury was told the evidence "may be considered by you only for the
            limited purpose of determining if it tends to show there are, for example,
21          sufficient similarities between this earlier offense and our charged offense
            such that it may help you decide in this case. . . were [the defendant's] acts
22          intentional as opposed to accidental.  Does the prior killing serve to
            identify Mr. James as the culprit of the charged offense before you.  [Do]
23          the prior circumstances of the earlier crime show motive that might then
            explain why this crime was committed in this case[.]  [Do] the
24          circumstances of the prior crime serve to assist you in determining whether
            the charged crime involved circumstances as alleged of torture."

25

26  / / /

1   Petitioner argues that the trial court erred in allowing this evidence because its probative value

2   was outweighed by its prejudicial effect and because it was essentially improper propensity

3   evidence.  Specifically, petitioner asserts:

4                . . . There was insufficient similarity [sic] between the 1974
             homicide and the charged murder to make the evidence admissible. . ., and
5            as to motive, there was not the required connection or nexus between the
             incidents.  Evidence of the 1974 murder showed only a propensity to
6            commit murder, and its admission violated James' 14th Amdt. right to a
             fair trial.
7

8                In denying this claim, the Court of Appeal began with the propensity issue.  The

9   court observed that, under California law, evidence the defendant committed a prior crime is

10  generally not admissible to prove bad character or criminal propensity, such as identity, intent, or

11  motive.  See Cal. Evid. Code § 1101(a), (b); see also People v. Kipp, 18 Cal.4th 349, 369 (1998).

12  However, where the prior crime is sufficiently similar to the charged crime, it is considered

13  relevant.  See People v. Ewoldt, 7 Cal.4th 380, 402-03 (1994).   Though a high degree of

14  similarity is required for evidence of a prior crime to be relevant on the issue of identity, the least

15  similarity is required to establish relevance on the issue of intent.  See id.  As to intent, the prior

16  crime need only be sufficiently similar to support an inference the defendant probably harbored

17  the same intent in both instances.  See Kipp, 18 Cal.4th at 371.  The state court agreed with the

18  trial court that a high enough degree of similarity existed to establish relevance as to intent,

19  motive, and identity.  Specifically, the state court held:

20               In this case the trial court found the two crimes were sufficiently
             similar to make the prior crime relevant on the issue of intent, absence of
21           accident or mistake, identity, and motive.  The court reasoned that in both
             cases defendant had similar motives for murder.  In one, the victim talked
22           too much, and in the other the victim chewed him out all the time.  Also,
             in both cases the defendant chose a method of killing that resulted in a
23           cruel form of death.  Both victims were women who were close to
             defendant.
24

25  ///

26  ///

13

1    The state court next addressed whether the evidence of the 1974 murder was

2    unduly prejudicial, observing that the relevant factors under California law are:  (1) similarity to

3    the charged offense; (2) the extent to which the source of the evidence is independent of the

4    charged offense; and (3) the amount of time between the prior offense and the current offense.

5    See Ewoldt, 7 Cal.4th at 404.  The state court concluded that the evidence was admissible under

6    these factors, reasoning:

7              . . . As previously noted the two killings were similar in that both
         victims were women close to defendant, both women antagonized
8         defendant by constantly talking to him or "chewing on" him, and both
         women were killed in an extremely cruel fashion  The source of the
9         evidence of the prior killing was completely independent.  There was a
         significant amount of time between the two offenses, but on balance, the
10        evidence was probative of the issues for which it was admitted.

11   The court added:

12             . . . Although the evidence of the prior murder was disturbing, it
         paled in comparison to the brutal killing of Stollberg, who was burned
13        alive.  Under these circumstances, we cannot say the trial court abused its
         discretion in determining the probative value of the evidence was not
14        substantially outweighed by the risk of undue prejudice.

15   The state court also held that admission of the evidence of the 1974 murder did not render the

16   trial fundamentally unfair because the evidence of petitioner's guilt for the Stollberg murder was

17   so strong that the jury would have reached the same conclusion even had it not known about the

18   1974 crime.

19   As with petitioner's sufficiency of the evidence claim, the state court applied the

20   correct federal due process standard by determining whether admission of evidence of the 1974

21   murder conviction rendered the trial fundamentally unfair.  Therefore, this court reviews to

22   determine whether the state court's denial of this claim was an unreasonable application of the

23   law.  Regardless of whether the trial court's decision to admit evidence of the 1974 murder was

24   correct under state law, the court is persuaded by the Court of Appeal's logic that admission of

25   the evidence could not have violated due process because, on the strength of all the other

26   evidence, the jury would have convicted petitioner even without evidence of the 1974 murder.

14

2.    Victim's Confession

The state court provided the following background to this claim:

> Defendant sought to introduce evidence that the victim . . . had confessed to strangling a man.  Stollberg was never arrested for murder because it was never established there was any foul play in the man's death.  Defendant wanted to introduce the evidence for the purpose of impeaching Stollberg's statement that "he" tried to kill her by throwing gasoline on her and setting her on fire.  He also wanted to introduce the evidence to show Stollberg had a violent character.  The trial court refused to allow the evidence, reasoning it had little relevance, was cumulative because there was already evidence of the victim's aggressive nature, and would consume an undue amount of time, as the jury would be hearing testimony on whether yet a third crime had been committed.

In the instant petition, petitioner states that he sought to introduce the evidence of the victim's confession for two purposes:  (1) to impeach Stollberg's credibility; and (2) to show that Stollberg was potentially the aggressor.  As the state court concluded, the confession evidence was not relevant as to either point.  Regarding credibility, nothing about the confession suggests that Stollberg was lying in her dying utterance implicating petitioner.  It also would not have established any bias against petitioner.  As to whether it would show Stollberg was the aggressor, that issue was not relevant because petitioner never argued self defense.  As petitioner admits, his defense at trial was lack of adequate proof, not justification.  Because the evidence of Stollberg's confession was irrelevant, its exclusion could not have rendered the trial fundamentally unfair.

3.    1974 Police Reports

Two reports are at issue.  The Court of Appeal provided the following background:

> The prosecution called Patricia McKittrick as a witness.  McKittrick was a City of Richmond police officer who investigated the murder of Betty Keith in 1974.  McKittrick read from a police report she wrote in 1974 after interviewing Donna Ogles, one of defendant's neighbors.  Ogles testified as well.  [¶] The report was offered pursuant to Evidence Code section 1237 . . . .
>
> * * *

/ / /

15

1
        The trial court ruled there was a sufficient foundation for the report after defendant objected on the ground McKittrick had not sufficiently
2
substantiated her report. . . .

3
              * * *

4
        Defendant also argues the trial court erred in admitting another McKittrick report containing a transcription of a tape recorded interview
5
of defendant.
        McKittrick testified she had a vague recollection of her interview
6
with defendant.  Her practice was to tape record the interview, then transcribe it herself using a typewriter.  Afterward she would send the
7
document to the secretarial pool to be retyped in a neat form.  She would check the document for accuracy when she received it back from the
8
typing pool, although she did not routinely re-listen to the tape.
        Defendant objects to the admission of the transcript on two
9
grounds.  First, he asserts the transcript, like the police report, was not properly authenticated.  Second, he claims the transcript was not a past
10
recollection recorded, but a mechanical rendition of the recording.

11
In the instant petition, petitioner argues that admission of the two reports, including the

12
transcript, violated his constitutional rights because both are hearsay.

13
        The Confrontation Clause protects a defendant from unreliable hearsay evidence

14
being presented against him during trial.  See U.S. Constitution, Amendment VI.  Prior to the

15
Supreme Court's decision in Crawford v. Washington, 541 U.S. 36 (2004), the admission of

16
hearsay evidence did not violate the Confrontation Clause where the hearsay fell within a firmly

17
rooted exception to the hearsay rule or otherwise contained "particularized guarantees of

18
trustworthiness."  Lilly v. Virginia, 527 U.S. 116, 123-24 (1999); Ohio v. Roberts, 448 U.S. 56,

19
66 (1980).  In Crawford, however, the Supreme Court announced a new rule:  Out-of-court

20
statements by witnesses not appearing at trial that are testimonial are barred under the

21
Confrontation Clause unless the witnesses are unavailable and the defendant had a chance to

22
cross-examine, regardless of whether such statements are deemed reliable by the trial court.  See

23
541 U.S. at 51.  If error occurred, the next question is whether such error was harmless.  See

24
Bockting v. Bayer, 399 F.3d 1010, 1022 (9th Cir. 2005) (applying harmless error analysis).

25
///

26
///

1    While the Supreme Court in <u>Crawford</u> "le[ft] for another day any effort to spell

2  out a comprehensive definition of 'testimonial,'" the Court provided some guidance. 541 U.S. at

3  68.  The Court observed that "[a]n accuser who makes a formal statement to government officers

4  bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."

5  <u>Id.</u> at 51; <u>see</u> <u>also</u> <u>Davis v. Washington</u>, ___U.S.___, 126 S.Ct. 2266 (2006) (holding that law

6  enforcement interrogations directed at establishing the facts of a past crime or in order to identify

7  the perpetrator are testimonial).   Because <u>Crawford</u> was decided before petitioner's conviction

8  became final, it is applicable in this case.

9    Under <u>Crawford</u>, admission of the reports may have violated constitutional

10  principles because both were clearly testimonial in nature.  Specifically, both were out-of-court

11  statements to police offered in the course of a criminal investigation.  However, any error was

12  harmless because, as discussed above in the context of petitioner's claim concerning evidence of

13  the 1974 murder conviction, the outcome of the trial would have been the same even if there was

14  no evidence whatsoever presented concerning petitioner's involvement in the 1974 crime.  In

15  other words, the court cannot say that admission of the reports had a substantial and injurious

16  effect on the outcome of the trial.  To the contrary, admission of the reports likely had no effect

17  on the outcome of the trial given the other evidence of petitioner's guilt.  For this same reason,

18  the court also concludes that no due process violation resulted from admission of the reports.

19  **C.    Ineffective Assistance of Counsel**

20    The Sixth Amendment guarantees the effective assistance of counsel.  The United

21  States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

22  <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  First, a petitioner must show that, considering

23  all the circumstances, counsel's performance fell below an objective standard of reasonableness.

24  <u>See</u> <u>id.</u> at 688.  To this end, petitioner must identify the acts or omissions that are alleged not to

25  have been the result of reasonable professional judgment.  <u>See</u> <u>id.</u> at 690.  The federal court must

26  then determine whether, in light of all the circumstances, the identified acts or omissions were

1   outside the wide range of professional competent assistance.  See id.  In making this

2   determination, however, there is a strong presumption "that counsel's conduct was within the

3   wide range of reasonable assistance, and that he exercised acceptable professional judgment in all

4   significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing

5   Strickland, 466 U.S. at 689).

6            Second, a petitioner must affirmatively prove prejudice.  See Strickland, 466 U.S.

7   at 693.  Prejudice is found where "there is a reasonable probability that, but for counsel's

8   unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A

9   reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.;

10  see also Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not

11  determine whether counsel's performance was deficient before examining the prejudice suffered

12  by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an

13  ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

14  followed."  Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at

15  697).

16           In the context of his arguments regarding the victim's confession, petitioner

17  asserts:

18           If counsel waived James' constitutional claims [concerning the
             confession evidence], counsel rendered ineffective assistance.  U.S. Const.,
19           6th & 14th Amdts.   Waiver would no[t] be the result of diligent advocacy
             by a reasonably competent defense attorney, for all counsel had to do was
20           cite the 6th and 14th Amdts. in making his arguments counsel has a duty to
             preserve points for appellate review.  Counsel sought admission of the
21           other crimes evidence, which shows there was[] not tactical reason for his
             omission, and thus deficient performance has been shown.
22

23  Trial counsel was not deficient in any way with respect to the confession evidence.  First, the

24  record reflects that trial counsel made a good attempt to have the evidence admitted.  Second,

25  there was no need for counsel to raise federal constitutional arguments at the trial level in support

26  of admission of the confession evidence because the trial court was bound to decide the matter on

the basis of state law.  Moreover, the record reveals that, even though no constitutional argument was made at the trial level, petitioner was not prejudiced because the argument was nonetheless considered on direct appeal.  In particular, the Court of Appeal concluded that "[t]he exclusion of Stollberg's character evidence did not violate defendant's constitutional rights."

## IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that:

1.      Petitioner's petition for a writ of habeas corpus (Doc. 1) be denied; and

2.      The Clerk of the Court be directed to enter judgment and close this file.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 20 days after being served with these findings and recommendations, any party may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  March 12, 2008

_Craig M. Kellison_
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE

19